620 A.2d 356

**BAKER, WATTS & COMPANY**

**v.**

**MILES & STOCKBRIDGE, et al.**

**No. 518, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

Feb. 24, 1993.

146

148

150

154

David F. Albright and Harry M. Rifkin (Semmes, Bowen & Semmes, on the brief), Baltimore, for appellant.

Francis B. Burch, Jr. and David Clarke, Jr. (Piper & Marbury, on the brief), Baltimore, for appellees.

Argued before WILNER, C.J., and GARRITY and HARRELL, JJ.

HARRELL, Judge.

On 20 October 1989, Baker, Watts & Co., appellant, filed suit in the Circuit Court for Baltimore City against Miles & Stockbridge and one of its partners, Timothy R. Casgar, appellees, alleging malpractice, breach of contract, and negligent misrepresentation and seeking contribution under the Maryland Securities Act, Md. Corps. & Ass'ns Code Ann. §§ 11–101 to –805 (1993) (hereinafter the Maryland Securities Act or the Act). On 30 November 1989, appellees filed a motion to dismiss pursuant to Md.Rule 2–322(b). On 21 December 1989, Baker, Watts filed a motion to consolidate this action, in accordance with Md.Rule 2–503, with a previously filed action, which had been dismissed from federal court, because the actions were based on the same set of events and involved identical parties and identical questions of law and fact.

On 9 May 1990, a hearing was held on appellees' motion to dismiss. By order of even date, the circuit court (Ross, J.) granted the motion to dismiss as to Baker, Watts's claims for malpractice, breach of contract, and negligent misrepresentation because the statute of limitations had run. The circuit court deferred until trial its decision on the motion to dismiss as to Baker, Watts's claim for contribution under § 11–703 of the Maryland Securities Act.

Appellees filed a "renewed" motion to dismiss Baker, Watts's remaining claim on 8 January 1991. On 11 February 1991, the circuit court denied this motion.

The day before trial, 17 December 1991, appellees filed a motion for summary judgment pursuant to Md.Rule 2–501.[1] The following day, appellees also filed a motion *in limine* seeking to bar Baker, Watts, its counsel, and its witnesses from making any reference to a prior proceeding in federal court out of which this case arose. On the morning set for trial, 18 December 1991, the circuit court (Davis, J.) heard oral argument on appellees' motion for summary judgment. Although counsel for Baker, Watts argued against the motion, he also argued that his client should be given fifteen days to respond to appellees' motion. The circuit court granted appellees' motion for summary judgment as to Baker, Watts's remaining claim. The circuit court also granted the motion *in limine* as a precautionary measure should the case ever be tried.

On 30 December 1991, Baker, Watts filed a motion for reconsideration of the order granting summary judgment.[2] The circuit court denied the motion for reconsidera-

---

1. Baker, Watts claims that this motion for summary judgment was filed the morning of trial. The record, however, clearly shows that the motion was filed on 17 December 1991. The docket entry lists this date, as does the date stamped copy of the motion contained in the record. We treat the motion for summary judgment as filed on 17 December 1991.

2. We note that this motion qualifies as one filed within ten days of final judgment. Because 28 December 1991, ten days from the entry

tion by order dated 4 February 1992. Baker, Watts noted a timely appeal to this Court on 4 March 1992.

## Background

In 1981, Baker, Watts acted as the lead dealer-manager in a private offering and sale of limited partnership interests in Superior Drilling Partners '81 (Partners '81). Superior Petroleum, Inc. (Superior) was the general partner. Baker, Watts retained appellees to perform all necessary legal services in connection with this offering and sale.

On 9 March 1981, the private offering of the interests in Partners '81 began with the issuing of a Confidential Offering Memorandum. Appellees drafted the offering memorandum and a tax opinion, which was included in the memorandum. The private offering closed on 1 June 1981.

In January 1981, prior to the private offering, a purchase of stock in Superior had been consummated to resolve a deadlock between the two controlling groups of Superior—Anthony Biondi, Superior's President, and the Spring brothers—each of whom owned a fifty percent interest in the company. Eighteen individuals from Baltimore (the Baltimore Group), purchased from Biondi and the Spring brothers a one-third interest in Superior. Appellee Casgar was a member of the Baltimore Group, as were fourteen partners and two employees from Baker, Watts. Casgar owned 4.2% of the stock in Superior and the partners and employees from Baker, Watts collectively owned approximately twenty-eight percent of the stock.

Conflicting allegations are made by the parties that during the private offering period from 9 March 1981 to 1 June 1981 several communications took place between Biondi and certain members of the Baltimore Group concerning the

---

of summary judgment, was a Saturday, Baker, Watts had until Monday, 30 December 1991, to file the motion for reconsideration. Md. Rule 1–203(a)(1). Thus, the judgment lost its finality for purposes of appeal until the circuit court ruled on the motion. *Unnamed Attorney v. Attorney Grievance Comm'n,* 303 Md. 473, 486, 494 A.2d 940 (1985).

sale of the Baltimore Group's stock to Biondi. Baker, Watts claims that Casgar, along with Hugh Grady, a Baker, Watts employee, handled the negotiations with Biondi. In contrast, appellees argue that only Grady took part in the negotiations to sell the stock. Eventually, on 1 July 1981, one month after the private securities offering closed, the Baltimore Group sold its stock to Biondi.

The bright future predicted for Partners '81 did not become reality. By June of 1982 the limited partnership was in receivership. In April of 1983, certain investors who had purchased limited partnership interests in Partners '81 during the private offering brought suit in federal court against Baker, Watts, *Adalman v. Baker, Watts & Co.*, No. Y–83–2485 (D.Md.1985).[3] The *Adalman* investors alleged that the Confidential Offering Memorandum contained material omissions in violation of § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2) (1988), and § 11–703(a)(1)(ii) of the Maryland Securities Act. On 16 May 1985, a jury found that Baker, Watts had violated the federal and state securities laws by failing to disclose the negotiations between the Baltimore Group and Biondi in the offering memorandum. The investors obtained a judgment for $1,916,314.17, which was entered by the district court on 31 July 1985. After an unsuccessful appeal by Baker, Watts, *Adalman v. Baker, Watts & Co.*, 807 F.2d 359 (4th Cir.1986), the parties entered into a settlement agreement, and on 28 November 1986, Baker, Watts paid the *Adalman* investors approximately $2.3 million. Also, in accordance with the terms of the settlement agreement, the parties entered into a stipulation that the case be dismissed with prejudice and that the judgment entered against Baker, Watts be vacated. On 3 December 1986, the United States District Court for the

---

**3.** Hereinafter we will refer to the investors who bought limited partnership interests and subsequently filed suit against Baker, Watts as "the *Adalman* investors." In addition, hereinafter we refer to the proceedings in *Adalman v. Baker, Watts & Co.*, No. Y–83–2485 (D.Md. 1985) and *Adalman v. Baker, Watts & Co.*, 807 F.2d 359 (4th Cir.1986), collectively, as "the *Adalman* case."

District of Maryland signed an order giving effect to the parties' stipulation.

On 23 October 1987, Baker, Watts filed almost identical actions against appellees in the U.S. District Court for the District of Maryland and the Circuit Court for Baltimore City. Baker, Watts sought indemnification and contribution under § 12(2) of the Securities Act of 1933 and § 11–703 of the Maryland Securities Act, and brought state common law claims for malpractice, breach of contract, and negligent misrepresentation.

On 24 November 1987, on a motion filed by appellees, the state action was removed to federal court. On 18 March 1988, the U.S. District Court denied Baker, Watts's motion to remand the state action and consolidated the two cases pursuant to Rule 42(a) of the Federal Rules of Civil Procedure. Appellees filed a motion to dismiss Baker, Watts's claims, which the court treated as a motion for summary judgment because it presented matters outside the pleadings. Fed.R.Civ.P. 12(b). Ultimately, the district court granted appellees' motion for summary judgment regarding the claims under the federal and state securities laws. The district court remanded the state common-law claims for malpractice, breach of contract, and negligent misrepresentation to the Circuit Court for Baltimore City. *Baker, Watts & Co. v. Miles & Stockbridge,* 690 F.Supp. 431 (D.Md.1988).

Both parties appealed to the United States Court of Appeals for the Fourth Circuit. On appeal, the Fourth Circuit held: (1) private rights of action for contribution and indemnification are not available under § 12(2) of the Securities Act of 1933; (2) Baker, Watts's state statutory and common-law claims, to the extent that they provide a cause of action for indemnification, must fail because they are preempted by federal law, which does not allow indemnification; and (3) the district court erred in resolving, on the merits, Baker, Watts's claim for contribution under § 11–703 of the Maryland Securities Act. The Fourth Circuit also instructed the district court to dismiss without preju-

dice all pendent state claims, except those seeking indemnification. *See Baker, Watts & Co. v. Miles & Stockbridge,* 876 F.2d 1101 (4th Cir.1989).

On 20 September 1989, in accordance with the decision by the Fourth Circuit, the district court ordered the following: (1) Baker, Watts's claim for indemnification under § 11–703 was dismissed with prejudice; (2) Baker, Watts's claim for contribution under § 11–703 was dismissed without prejudice; and (3) Baker, Watts's state common-law claims for malpractice, breach of contract, and negligent misrepresentation were dismissed without prejudice subject to the preemptive scope of the federal securities laws as discussed by the court of appeals in its decision.

We will include additional facts as necessary in our discussion of the issues presented.

### Issues

Appellant presents the following issues for our review: I. Whether the trial court erred in considering appellees' motion for summary judgment on the morning set for trial without granting appellant fifteen days to respond; II. Whether there are material questions of fact in dispute which would preclude the grant of summary judgment; III. Whether the circuit court erred when it dismissed appellant's state common-law claims for malpractice, breach of contract, and negligent misrepresentation as barred by the statute of limitations; and IV. Whether the circuit court erred in granting appellees' motion *in limine.*

### Discussion

### I.

■ Baker, Watts first claims that the circuit court erred in hearing argument on appellees' motion for summary judgment instead of proceeding to trial as originally scheduled. Baker, Watts contends that the Maryland Rules

require that a party be given fifteen days to file a response to a motion for summary judgment. In addition, appellant argues that its due process rights were violated because it was not afforded proper notice or allowed to put factual evidence in the record.

 Under the Maryland Rules, a party may file a motion for summary judgment at any time in a proceeding. Md. Rule 2–501(a); *Myers v. Montgomery Ward & Co.*, 253 Md. 282, 289–90, 252 A.2d 855 (1969); *Ralkey v. Minn. Mining & Mfg. Co.*, 63 Md.App. 515, 522, 492 A.2d 1358 (1985); *Joy v. Anne Arundel County,* 52 Md.App. 653, 660–61, 451 A.2d 1237 (1982), *cert. denied,* 295 Md. 440 (1983). Ordinarily, a party against whom a motion is directed must file a response within fifteen days after being served with the motion. Rule 2–311(b). If the motion is based on facts not contained in the record, the response must be supported by affidavit and accompanied by any papers on which the response is based. Rule 2–311(d).

 We agree that the circuit court did not strictly comply with Rule 2–311 when it failed to give Baker, Watts an opportunity to file a response to the motion for summary judgment. On appeal, however, Baker, Watts must show not only error committed by the work in circuit court, but also that the error was prejudicial. *Beahm v. Shortall,* 279 Md. 321, 330–31, 368 A.2d 1005 (1977); *Rippon v. Mercantile–Safe Deposit & Trust Co.,* 213 Md. 215, 222, 131 A.2d 695 (1957). An error is prejudicial if it affected the outcome of the case. *See, e.g., I.W. Berman Properties v. Porter Bros., Inc.,* 276 Md. 1, 11–12, 344 A.2d 65 (1975); *State Rds. Comm'n v. Kuenne,* 240 Md. 232, 235, 213 A.2d 567 (1965). If an error does not affect the outcome of the case it is harmless, and an appellate court will not reverse a lower court for harmless error. *Beahm,* 279 Md. at 331, 368 A.2d 1005; *I.W. Berman Properties,* 276 Md. at 11–12, 344 A.2d 65.

We do not believe that the error committed by the circuit court was, in any way, prejudicial to Baker, Watts. At the

hearing, Baker, Watts's counsel was able to articulate the facts upon which his client would be relying if the case were to go to trial. In addition, in its motion for reconsideration, Baker, Watts essentially reiterated, although in a more organized fashion, the same factual arguments it presented at the hearing on the motion for summary judgment. Indeed, Baker, Watts presents the same factual arguments on appeal to this Court. Baker, Watts has, therefore, failed to establish that it was prejudiced by the circuit court hearing the motion for summary judgment on the morning set for trial.

■ Baker, Watts also contends that its due process rights were violated because it was not given adequate notice of the hearing. Nor was Baker, Watts given the opportunity to present evidence on the record to support its claims. To support its position, Baker, Watts relies on the Court of Appeals decision, *Blue Cross of Md., Inc. v. Franklin Square Hosp.*, 277 Md. 93, 352 A.2d 798 (1976), in which the Court set forth the relevant due process requirements:

> Generally, due process requires that a party to a proceeding is entitled to both notice and an opportunity to be heard on the issues to be decided in a case. Thus, unless an issue decided by the court is raised by the pleadings, or a party otherwise receives adequate notice of an issue during the course of a proceeding, due process is denied.

*Id.* at 101, 352 A.2d 798 (citations omitted). We believe Baker, Watts misconstrues this passage's application to its claim for denial of due process.

Baker, Watts claims that it was not afforded proper notice of the summary judgment motion. Rule 2–501(a), however, clearly provides that a motion for summary judgment may be made at any time. We do not believe it is unreasonable that a party should be aware of such a provision in the rules. In addition, Baker, Watts had adequate notice that establishing appellees as persons liable for contribution under § 11–703 of the Maryland Securities Act

would be a major obstacle to Baker, Watts's claims. First, on 21 December 1989, appellees filed a motion to dismiss the claim for contribution. Second, in their answer, filed 19 June 1990, appellees stated: "[T]he defendants [appellees] cannot be liable to Baker, Watts for contribution under Section 11–703(c)(2) because they could not have been jointly and severally liable to the investors under Section 11–703(c)(1)." Third, appellees "renewed" their motion to dismiss the state securities law claim for contribution on 8 January 1991. Finally, the U.S. District Court for the District of Maryland had granted summary judgment in favor of appellees, finding that they were not parties who could be held liable under § 11–703.[4] Thus, it is clear from the record extract that Baker, Watts had adequate notice that appellees' liability for contribution under § 11–703 was in issue. Indeed, this was the very heart of Baker, Watts's case, which it should have been prepared to establish by the morning set for trial. *See Placido v. Citizens Bank & Trust Co. of Md.*, 38 Md.App. 33, 42, 379 A.2d 773 (1977) (trial court's grant of plaintiff's motion for summary judgment at close of plaintiff's case was not denial of due process).

Nor do we believe that Baker, Watts was denied an opportunity to be heard on the issue. Baker, Watts was prepared to go to trial the same day that the circuit court held the hearing on the motion for summary judgment. Pre-trial discovery had been completed. It was not unreasonable to expect that Baker, Watts's counsel would have been prepared to give an opening statement describing what he believed the evidence would show. At that point, Baker, Watts should have had a complete grasp of the case

---

**4.** The Fourth Circuit reversed the district court decision concerning appellees' liability under § 11–703, concluding that there was no state authority addressing the question before it and that the state courts should be given an opportunity to construe the Maryland Securities Act. *Baker, Watts & Co. v. Miles & Stockbridge*, 876 F.2d 1101, 1109 (4th Cir.1989). We believe, however, that the district court's ruling put Baker, Watts on notice that it would likely face this problem in state court.

it wanted to present, especially with regard to this essential element. With the parties in such a state of preparedness, there was no denial of due process when the circuit court asked Baker, Watts's counsel to proffer *any* facts they intended to prove that would support a finding of liability under § 11–703. Compare *Phillips v. Venker,* 316 Md. 212, 222, 557 A.2d 1338 (1989) (denial of due process found when counsel could not effectively participate in hearing because he was not given opportunity to review file, collect thoughts, or otherwise prepare); *Van Schaik v. Van Schaik,* 90 Md.App. 725, 739, 603 A.2d 908 (1992) (denial of due process found because party did not have an opportunity for effective argument on issue when party had no notice that issue would be considered and there was no discussion of the issue at the hearing); *Placido,* 38 Md.App. at 42, 379 A.2d 773 (trial court's grant of plaintiff's motion for summary judgment at close of plaintiff's case was not a denial of due process where record shows defendant had opportunity to suggest the existence of a material factual dispute).

## II.

Baker, Watts next argues that there are material questions of fact in dispute that should have precluded the circuit court from granting appellees' motion for summary judgment. A trial court may grant a motion for summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 2–501(e). This procedure is not to be used as a substitute for trial, but is merely a means by which a trial court may determine if a trial is necessary. *Wash. Homes, Inc. v. Interstate Land Dev. Co.,* 281 Md. 712, 716, 382 A.2d 555 (1978). In reviewing a disposition by summary judgment, we must first decide whether a material factual dispute exists and, in doing so, will resolve all factual inferences against the moving party. *McDermott v. Hughley,* 317 Md. 12, 22, 561 A.2d 1038 (1989); *King v. Bankerd,* 303 Md. 98, 110–12, 492 A.2d 608 (1985); *Syme v. Marks Rentals, Inc.,* 70 Md.App. 235, 238–39, 520 A.2d 1110 (1987). A material fact is one that will affect the outcome

of the case; thus, a dispute as to a non-material fact will not preclude a trial court from granting summary judgment. *Bankerd,* 303 Md. at 111, 492 A.2d 608. When a moving party establishes sufficient grounds for summary judgment, the opposing party must demonstrate, in some degree of detail, that there is a genuine dispute of material fact. *Id.* at 112, 492 A.2d 608. A general denial is insufficient to defeat a motion for summary judgment. *Id.* If there are no material factual disputes, then we must decide whether the trial court was legally correct, because the trial court decides issues of law, not fact, when granting summary judgment. *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 591–92, 578 A.2d 1202 (1990).

Baker, Watts first argues that the circuit court erroneously focused solely on the issue of whether appellee Casgar was involved in the sale of interests in Partners '81. Our review of the record extract reveals no such error. Baker, Watts presented several factual arguments to counter appellees' motion for summary judgment. In its oral ruling, the circuit court addressed every one of those arguments and did not focus solely on Casgar's involvement in selling interests in Partners '81.

Baker, Watts next claims that appellees are among the persons that may be held liable under § 11–703 of the Maryland Securities Act and presents this Court with several factual and legal bases to support its position. In the case *sub judice,* we must determine the meaning and effect of § 11–703; therefore, we first set forth the principles of statutory construction that will apply throughout our discussion of Issue II.

The cardinal rule of statutory construction is to ascertain and effectuate the intention of the General Assembly. *Jones v. State,* 311 Md. 398, 405, 535 A.2d 471 (1988); *State v. Intercontinental, Ltd.,* 302 Md. 132, 137, 486 A.2d 174 (1985). To fulfill this function, we must consider the words of the statute in their natural and ordinary significance. *Rucker v. Comptroller of the Treasury,* 315 Md. 559, 565, 555 A.2d 1060 (1989); *NCR Corp. v.*

*Comptroller of the Treasury*, 313 Md. 118, 124, 544 A.2d 764 (1988). This Court will not resort to strained, subtle, or forced interpretations in order to limit or extend the operation of a statute. *Dickerson v. State*, 324 Md. 163, 171, 596 A.2d 648 (1991); *City of Baltimore v. Hackley*, 300 Md. 277, 283, 477 A.2d 1174 (1984). Where "there is no ambiguity or obscurity in the language of a statute, there is usually no need to look elsewhere to ascertain the intent of the General Assembly." *Hackley*, 300 Md. at 283, 477 A.2d 1174. Finally, "[a]bsent a clear indication to the contrary, a statute, if reasonably possible, is to be read so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Bd. of Educ. of Garrett County v. Lendo*, 295 Md. 55, 63, 453 A.2d 1185 (1982).

Baker, Watts argues that the circuit court erred in finding that appellees were not parties that could be held liable under § 11–703 of the Maryland Securities Act. Baker, Watts first refers us to § 11–703(c), which imposes joint and several liability on several categories of persons. Section 11–703(c) provides, in pertinent part:

> *Others jointly and severally liable with seller or purchaser.*—(1) Every person who directly or indirectly controls a person liable under subsection (a) of this section ... every employee of the person liable who materially aids in the conduct giving rise to the liability, and every broker-dealer or agent who materially aids in such conduct are also liable jointly and severally with and to the same extent as the person liable....
>
> (2) There is contribution as in cases of contract among the several persons so liable.

"Person" is defined in § 11–101(*l*) as:

> [A]n individual, a corporation, a partnership, an association, a joint-stock company, a trust where the interests of the beneficiaries are evidenced by a security, an unincorporated organization, a government, or a political subdivision of a government.

Baker, Watts argues that appellees fall within three categories of persons that may be held liable under § 11–703(c).

They are: agents, controlling persons, and employees. Baker, Watts further contends that appellees may be held liable as sellers under § 11–703(a). We address each category separately.

### *Is There a Material Factual Dispute That Appellees Were Agents of Baker, Watts?*

Baker, Watts argues that it presented sufficient facts to the circuit court to establish the existence of an agency relationship between the parties, and thus, sufficient to defeat the motion for summary judgment. The facts to which Baker, Watts refers this Court include: (1) appellees represented and assisted Baker, Watts in effecting the sale of the partnership interests in Partners '81; (2) appellees represented the Baltimore Group in the sale of its interest in Superior; (3) Casgar was an equity owner of Superior and, therefore, he had a personal and financial interest in the sale of the limited partnerships in Partners '81; (4) appellees acted as legal counsel to Baker, Watts, Partners '81, and two members of the Superior board of directors; (5) Casgar prepared the Confidential Offering Memorandum for Partners '81; and (6) Casgar gave a tax opinion to the Partners '81 investors. Baker, Watts also claims that the circuit court erroneously ignored the common-law definition of agency, which includes an attorney-client relationship.

Section 11–101(b) of the Maryland Securities Act defines "agent" as:

[A]n individual other than a broker dealer who represents a broker-dealer or issuer in effecting or attempting to effect the purchase or sale of securities.

The comment to § 401 of the Uniform Securities Act, from which § 11–101(b) was taken, states that the definition of "agent" "depends upon much the same factors which create an agency relationship at common law." Unif.Sec.Act § 401, 7B U.L.A. 581 (1985).

Under Maryland common law, the attorney-client relationship is generally one of agency. *Brady v.*

*Ralph Parsons Co.,* 308 Md. 486, 510 n. 27, 520 A.2d 717 (1987); *Henley v. Prince George's County,* 305 Md. 320, 340 n. 5, 503 A.2d 1333 (1986). We do not believe, however, that this fact brings appellees within the definition of "agent" in § 11–101(b). Although the statutory definition is based upon factors similar to those used in the common-law definition, the definition in § 11–101(b) and the references to the term "agent" throughout the Act clearly reflect the General Assembly's intention to alter the common-law definition of agent. *See Hardy v. State,* 301 Md. 124, 131–32, 482 A.2d 474 (1984); *Gray v. State,* 43 Md.App. 238, 241–43, 403 A.2d 853 (1979), *cert. denied,* 286 Md. 747 (1980). Therefore, we must construe the meaning of the term "agent." Because this question has never been addressed in the State of Maryland, we first examine the approaches to this issue taken in other jurisdictions.

The Court of Appeals of Wisconsin, in *Rendler v. Markos,* 154 Wis.2d 420, 453 N.W.2d 202 (App.1990), discussed the liability of attorneys who, the plaintiff alleged, had materially aided in the creation of a false and misleading prospectus in a limited partnership offering. The Wisconsin court, interpreting a statutory definition of "agent" almost identical to § 11–101(b), stated:

> The definition of agent ... does not include attorneys who merely render legal advice or draft documents for use in securities transactions. The definition covers persons who assist directly in offering securities for sale, soliciting offers to buy, or performing the sale, but who do not fit the definition of broker-dealer. It is not intended to cover professionals such as attorneys engaging in their traditional advisory functions.

*Id.* 453 N.W.2d at 206.

In *Ackerman v. Schwartz,* 733 F.Supp. 1231 (N.D.Ind. 1989), *aff'd in part and rev'd in part on other grounds,* 947 F.2d 841 (7th Cir.1991), investors in an equipment leasing program brought suit against an attorney who wrote a tax opinion letter and the attorney's law firm. The defendants moved for summary judgment, claiming that

they were not agents within the meaning of the Indiana Securities Act. In construing the definition of "agent" in the Indiana Act, a definition similar to that in § 11–101(b), the district court focused on the meaning of the term "effect." The court held that liability under the Indiana Securities Act requires "more than the mere drafting of an opinion letter," and granted the defendants' motion. *Id.* at 1252. The attorney and his firm could have been held liable, however, if they had *"personally and actively* employed the opinion letter to *solicit* investors." *Id.* (emphasis supplied).

In *In re N. Am. Acceptance Corp. Sec. Cases,* 513 F.Supp. 608 (N.D.Ga.1981), purchasers of certain notes brought an action against several parties including the issuer's law firm, claiming, *inter alia,* violations of the Georgia Securities Act of 1957. The law firm moved for summary judgment claiming that it could not be held liable because it was not an "agent" as defined in the Georgia Act. The district court interpreted the Georgia Securities definition of "agent," [5] stating:

> To hold an individual to be an *agent* who has participated or aided in *making sales* of securities, the Court must find that the individual was so entangled in the actual sale of the security that his activities were at least a substantial factor in the purchaser's decision to buy the security and that his activities were either authorized by or ratified by the issuer.

*Id.* at 623.

In *Excalibur Oil, Inc. v. Sullivan,* 616 F.Supp. 458 (N.D.Ill.1985), an oil and gas lease purchaser brought an

---

**5.** The applicable section of the Georgia Securities Act of 1957 reads, in part:

Every sale or contract for sale in violation of any of the provisions of this Act ... shall be voidable at the election of the purchaser. The person making such sale or contract for sale, and every director, salesman or agent of or for such seller who shall have participated or aided in any way in making such sale, shall be jointly and severally liable to such purchaser....

1957 Ga.Laws, Vol. 1, p. 161.

action against the seller's attorney under, *inter alia*, the Uniform Securities Act of West Virginia. The attorney moved to dismiss the state securities law claim. The court, construing an almost identical statutory definition of "agent" as that found in § 11–101(b), held that the purchaser had stated a claim because of the direct role the attorney played in the sale of the leases. The attorney's direct role included "face-to-face and direct telephonic representations" to the purchaser. *Id.* at 467.

In *Ahern v. Gaussoin*, 611 F.Supp. 1465 (D.Or.1985), holders of demand notes brought suit against the issuer of the notes and its attorneys after the holders were unable to redeem the notes. The attorneys moved for summary judgment regarding the note holders' claims under the Oregon securities laws. Under the Oregon statute, liability "extends to 'every person who participates or materially aids in the purchase;' O.R.S. 59.115(3)." *Id.* at 1491. To participate or materially aid in the purchase "requires more than the mere preparation and execution of documents." *Id.* The district court, in denying the attorneys' motion for summary judgment, stated:

> [W]hen an attorney prepares, attends to the execution of, and personally delivers and files documents required for the registration of a security with the knowledge that solicitation and sales of such security have already been made, such conduct goes beyond what plaintiff describes as the "preparation of documents and other services normally performed by a lawyer for a client" so as to constitute "participa[tion]" or "materially aid[ing]" in the sale of such security.

*Id.* at 1491 (quoting *Adams v. Am. W. Sec., Inc.*, 265 Or. 514, 510 P.2d 838 (1973)).

Although the definition of "agent" in the state securities laws discussed above may vary to differing degrees from the definition in § 11–101(b), they each have one thing in common: they do not impose liability upon an attorney who merely provides legal services or prepares documents for

his or her client. To impose liability, the attorney must do something more than act as legal counsel.

We agree with the approaches taken by the courts in these cases. Therefore, we hold that an attorney could conceivably be considered an agent if he or she "represents a broker-dealer or issuer *in effecting or attempting to effect* the purchase or sale of securities." In order to be considered an "agent," an attorney must act in a manner that goes beyond legal representation. The definition of "agent" in § 11–101(b) does not include attorneys who merely provide legal services, draft documents for use in the purchase or sale of securities, or engage in their profession's traditional advisory functions. To rise to the level of "effecting" the purchase or sale of securities, the attorney must actively assist in offering securities for sale, solicit offers to buy, or actually perform the sale.

Our holding is further supported by §§ 11–401 and –402 of the Maryland Securities Act, which require an agent to be registered with the Securities Commissioner of the Division of Securities and which make it unlawful for a person to transact business in the State of Maryland as an agent unless that person is registered, respectively. An individual's registration or failure to register under the Maryland Securities Act is not dispositive of his, her or its status as an "agent"; however, we can infer from these sections that an "agent" as defined in the Act is something different from an agent at common law.

We now turn to the factual allegations that Baker, Watts believes establish that appellees are its "agents." None of the factual assertions are sufficient to overcome appellees' motion for summary judgment. At no point did Baker, Watts assert that appellees took part in the solicitation of offers to sell the limited partnership interests in Partners '81. Nor does Baker, Watts allege that appellees had any direct contact with the investors. Baker, Watts makes a general allegation that appellees represented it in effecting the sale of the limited partnership interests, but

offers no degree of detail. In addition, Baker, Watts alleges that Appellee Casgar prepared the Confidential Offering Memorandum and a tax opinion. Both these functions, however, are document preparation and are part of the legal services provided by an attorney in a securities offering. Finally, Baker, Watts refers to several transactions and negotiations, other than the solicitation of investors for Partners '81, in which appellees participated. This factual allegation is irrelevant because Baker, Watts failed to present any factual claims that appellees solicited investors *in the Partners '81 limited partnership offering.* As a result, the circuit court did not err in granting appellees' motion for summary judgment as to its status as an agent of Baker, Watts.

### *Is There a Material Factual Dispute that Appellees Controlled the General Partner, Superior?*

Baker, Watts argues that appellees were controlling persons of "a person liable," namely, the general partner of Partners '81, Superior. Baker, Watts claims that Superior is a person liable because it offered or sold the limited partnership interests in Partners '81 in violation of § 11–703(a)(1)(ii) of the Maryland Securities Act. Appellant claims that Casgar's control of the Baltimore Group and the Group's control of Superior implicate appellees as controlling persons under § 11–703(c)(1). Appellees counter that because Baker, Watts was the person held liable in the *Adalman* case, the suit out of which appellant's claim for contribution grows, the only relevant "controlling person" issue is whether appellees controlled Baker, Watts. Appellant, in its reply brief, contends that appellees attempt to read into § 11–703(c) a clause that is not present; i.e., that in order to seek contribution under § 11–703(c) the defendant must be a control person of the person against whom the *judgment* was rendered. Baker, Watts further claims that Superior "would have been sued" by the *Adalman* investors if it had not been insolvent at the time of the *Adalman* case.

 Based on the facts of this case, we do not believe that Baker, Watts can proceed against appellees for contribution based on joint and several liability when there is no judgment against the person, i.e., Superior, appellant claims is the principal perpetrator of the violation.[6] In reaching our decision, we are aided by federal court interpretations of sections of the federal securities acts that are similar to § 11–703(c). *See Caucus Distribs., Inc. v. Md. Sec. Comm'r,* 320 Md. 313, 324, 577 A.2d 783 (1990) (federal interpretations of provisions of the federal securities acts are helpful in analyzing similar provisions in the Maryland Securities Act).

The Securities Act of 1933 § 15 provides, in pertinent part:

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l* of this title, shall be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable....

---

**6.** We agree with Baker, Watts that the principal perpetrator of a § 11–703(a)(1)(ii) violation would be Superior and not Partners '81. We reach this conclusion for two reasons. First, the Private Confidential Offering Memorandum, under the subheading "Terms of Offering," expressly states that, "Superior Petroleum, Inc. offers preformation limited partnership interests" in Partners '81. Second, at the time of the private offering, Partners '81 had not yet been formed. Superior was only offering *"preformation* limited partnership interests." (Emphasis supplied). In fact, under the same subheading discussed above, the offering memorandum stated: *"If formed,* the Partnership [Partners '81] will engage in the exploration, development, production and operation of oil and gas properties." (Emphasis supplied). Partners '81, as an entity that was not yet formed, could not make an offering of limited partnership interests and, thus, could not be the primary perpetrator. Even if we included Partners '81 as a primary perpetrator along with Superior, it would be of no assistance to Baker, Watts because it cannot refer us to a judgment against Partners '81 from which Baker, Watts can seek to impose joint and several liability on appellees.

15 U.S.C. § 77*o* (1988). Section 20(a) of the Securities Exchange Act of 1934 provides, in relevant part:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable. . . .

15 U.S.C. § 78t (1988). "Controlling person" is given the same interpretation under both these acts because "[s]ection 20(a) [of the Exchange Act] is an analogue of section 15 of the Securities Act." *Pharo v. Smith*, 621 F.2d 656, 672–73 (5th Cir.), *aff'd in part and remanded in part on other grounds*, 625 F.2d 1226 (1980).

Recent federal case law clearly supports the proposition that the person who was the primary violator must be proceeded against in order for a plaintiff to attempt to impose joint and several liability on a controlling person. *See McCowan v. Sears, Roebuck & Co.*, 722 F.Supp. 1069, 1075–76 (S.D.N.Y.1989) (wholly-owned subsidiary was an indispensable party because plaintiffs' claims against defendant parent corporation were derivatively based on defendant's control of subsidiary); *FMC Corp. v. Boesky*, 727 F.Supp. 1182, 1199 n. 19 (N.D.Ill.1989) (pleadings failed because plaintiff must independently allege a violation by the "controlled person" before seeking to impose liability on the "controlling person"); *O'Keefe v. Courtney*, 655 F.Supp. 16, 19 (N.D.Ill.1985) (same); *In re Investors Funding Corp. of N.Y. Sec. Litig.*, 523 F.Supp. 533, 543 (1980), *reconsideration denied, certification of questions of law denied*, 36 B.R. 1019 (S.D.N.Y.1983) (same).

In contrast, the Seventh Circuit, in *Kemmerer v. Weaver*, 445 F.2d 76, 78 (7th Cir.1971), held that a defendant control person may be held liable even if the plaintiff fails to proceed against the principal violator—the controlled person. The *Kemmerer* Court, however, appeared to limit its holding to the facts of the case before it, where the controlling persons had voluntarily dissolved the controlled entity,

apparently in an attempt to avoid liability as controlling persons. Such a concern is not present in this State because when a Maryland corporation is voluntarily dissolved the directors become trustees of the corporation's assets; therefore, a party would still be able to proceed against the trustees of the corporation. *See* Md. Corps. & Ass'ns Code Ann. § 3–410 (1993). The *Kemmerer* case, however, has been referred to as authority in other federal cases. *See SEC v. Savoy Indus., Inc.,* 587 F.2d 1149, 1170 n. 47 (D.C.Cir.1978), *cert. denied,* 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979); *McCarthy v. Barnett Bank of Polk County,* 750 F.Supp. 1119, 1126–27 (M.D.Fla.1990).

■ Because we hold that there must be a judgment against Superior before appellant may seek contribution, we need not consider whether there was a material factual dispute regarding appellees' control of the general partner, Superior. If we were to reach appellant's factual argument, however, we would affirm the circuit court's grant of summary judgment because, as a matter of law, appellees did not "control" Superior.

In analyzing the term "control" in § 11–703(c), we again turn to the interpretation of that term, found in the federal securities laws, 15 U.S.C. §§ 77o and 78t(a), by the federal courts. *See Caucus,* 320 Md. at 324, 577 A.2d 783. Two basic tests for control have developed in the federal circuits. Both tests adopted by the federal courts are two-pronged. The first prongs of the tests are very similar, if not identical. Because we decide that appellees did not control Superior based on the first prongs of the tests adopted by the federal circuit courts, we need not decide which entire test is applicable under the Maryland Securities Act, nor do we adopt or endorse any particular test.

Initially, we observe that the Securities and Exchange Commission has defined "control" to mean:

[T]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of

a person, whether through ownership of voting securities, by contract, or otherwise.

17 C.F.R. § 230.405 (1992).

In *Durham v. Kelly*, 810 F.2d 1500 (9th Cir.1987), the Ninth Circuit reviewed its previous decisions that set forth the test to determine if a party was a "controlling person":

> To establish that someone is a "controlling person" the complainant must show that there was a relationship between the controlling and the controlled person and that actual power or influence was exerted over the alleged controlled person. *Kersh v. General Counsel*, 804 F.2d 546, 548 (9th Cir.1986).
>
> In *Christoffel v. E.F. Hutton & Co.*, 588 F.2d 665 (9th Cir.1978), we noted that Congress, in using the term "controlling person" intended to encompass all persons who *exerted* actual control over someone who violated the securities laws. *Id.* at 668.

*Id.* at 1503–04. *See also Buhler v. Audio Leasing Corp.*, 807 F.2d 833, 835 (9th Cir.1987).

In *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490 (7th Cir.1986), the Seventh Circuit, in discussing a law firm's and an accounting firm's controlling persons liability to purchasers of bonds and notes from a foundation which the firms advised, stated:

> The Firms had no ability to control the Foundation. Their ability to persuade and give counsel is not the same thing as "control," which almost always means the practical ability to *direct* the actions of the people who issue or sell securities.

*Id.* at 494.

The Eighth Circuit, in *Metge v. Baehler*, 762 F.2d 621 (8th Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986), quoting with approval from the district court opinion, stated the applicable legal standard to establish "controlling person" liability:

> [P]laintiffs must establish, first, that the defendant lender "actually participated in (i.e., *exercised* control over)

the operations of the corporation [the controlled person] in general...."

*Id.* at 631 (quoting *Metge v. Baehler,* 577 F.Supp. 810, 817 (S.D.Iowa 1984)). *See also Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 890–91 (3rd Cir.1975) (heavy consideration given to the power or potential power to influence or control the activities of the person primarily liable); *Hill York Corp. v. Am. Int'l Franchises, Inc.,* 448 F.2d 680, 694 (5th Cir.1971) (controlling person is one who has power to direct the management and policies of a person held liable under the securities laws); *Dowling v. Narragansett Capital Corp.,* 735 F.Supp. 1105, 1122 (D.R.I.1990) (directors, officers, and shareholders may be deemed "controlling persons" if they dominated the activities of the corporation); *Harrison v. Enventure Capital Group, Inc.,* 666 F.Supp. 473, 478 (W.D.N.Y.1987) (to be considered a control person, an individual must actively participate in the overall management and operation of the controlled entity).

The evidence that appellant presents regarding appellees' power to control Superior is insufficient, as a matter of law, to establish liability as a "controlling person" under § 11–703(c). Casgar had a strong influence over the Baltimore Group, but this Group was only a one-third owner of Superior. Although Casgar's recommendations were regularly adopted by the Baltimore Group, we make a distinction between Casgar's ability to *persuade* the Group and his ability to *direct* the actions of Superior. Indeed, appellant, in its brief, refers to appellees as "trusted advisors" and to Casgar as a "counselor and advisor." The Baltimore Group held two out of the five seats on the Superior board of directors, but there is no evidence of Casgar's ability to direct those board members in the way they would vote or act. Nor is there any evidence that those two board members from the Baltimore Group could overcome, subject to Casgar's control, the possibility of three opposing votes from the other board members.

Furthermore, we do not believe appellant's argument regarding Casgar's precise role in the negotiations to

sell the Baltimore Group's stock to Biondi is relevant to the question of who was a "controlling person" of Superior. Casgar, alone, held only a 4.2% interest in Superior. We do not find it persuasive that Casgar could, by the "simple task" of persuading only one other shareholder to join with him, give Biondi, who already held a forty-five percent interest in Superior,[7] a majority interest in the general partner. Baker, Watts is correct that a minority shareholder may, in certain circumstances, be found to be a "controlling person." *See SEC v. Int'l Chem. Dev. Corp.*, 469 F.2d 20, 28 (10th Cir.1972); *Hill York Corp. v. Am. Int'l Franchises*, 448 F.2d 680, 694 n. 20 (5th Cir.1971); *SEC v. R.A. Holman & Co.*, 377 F.2d 665, 667 (2d Cir.), *cert. denied*, 389 U.S. 991, 88 S.Ct. 473, 19 L.Ed.2d 482 (1967). We do not believe, however, that the necessary circumstances are present in this case to raise a question of fact that Casgar, as a minority shareholder, controlled Superior.

Appellant also refers us to a portion of Casgar's deposition testimony, which provides, in pertinent part:

Q. You are aware of the fact that Mr. Grady and Mr. Moran because [sic] Directors of Superior?

A. I am.

Q. Can you describe how that took place?

A. I think it is normal that a group which represents one-third of the shareholders typically has Board representation. And I believe in the discussions that occurred, that the issue was raised, and was agreed upon by all of the shareholders, that that was appropriate.

\* \* \* \* \* \*

Q. Was it in your mind, and to your knowledge, in the minds of any others who actually purchased the stock as individuals, at least, they would have some control by

---

7. At some point in time prior to the closing of the private offering, although an exact date is not ascertainable from the record extract, Biondi had increased his ownership interest in Superior by purchasing 175,000 previously unissued shares.

virtue of their stock ownership, over the operation of Superior?

A. Well, it was a five-man board. To the extent that two of the Board members were investors, and had business relationships with a group of other investors, there was that relationship.

The question of control, I think, is a conclusion.

Baker, Watts argues that Casgar admitted in this exchange that one could conclude *he* was in control of Superior. We believe Baker, Watts misreads this exchange, which, contrary to appellant's assertions, highlights how attenuated appellant's claim—that Casgar controlled Superior—truly is. Casgar was a member of a group that had board representation. Casgar was an *advisor* to that group. Simply because the group had board representation, it does not follow that Casgar was in control, to the extent that he could *direct* the management and policies of Superior. Indeed, the two individuals from the Baltimore Group who were given seats on the board of directors were both from Baker, Watts. Therefore, the circuit court did not err in granting appellees' motion for summary judgment regarding appellant's attempt to impose "controlling person" liability upon appellees.

### Is There a Material Factual Dispute That Appellees Were Employees of Baker, Watts?

Without referring this Court to any particular facts, Baker, Watts simply alleges that "the facts as presented also establish [appellees'] liability under § 11–703 of the Maryland Securities Act as employees of Baker, Watts." Appellant then argues that, while ordinarily, attorneys are not considered to be their client's employees, the "special nature and policy reasons" of the securities laws are such that attorneys can be held liable as employees pursuant to § 11–703(c).

Ordinarily, an attorney is considered to be an independent contractor. *Brady v. Ralph Parsons Co.*, 308 Md. 486, 510 n. 27, 520 A.2d 717 (1987); *Henley v. Prince*

*George's County,* 305 Md. 320, 340 n. 5, 503 A.2d 1333 (1986). This general rule, however, does not mean that an attorney may never be considered his or her client's employee. The Court of Appeals has adopted five criteria or factors that should be examined when determining whether an employer-employee relationship exists. The criteria include:

(1) The power to select and hire the employee,

(2) the payment of wages,

(3) the power to discharge,

(4) the power to control the employee's conduct, and

(5) whether the work is part of the regular business of the employer.

*Whitehead v. Safeway Steel Prods., Inc.,* 304 Md. 67, 77–78, 497 A.2d 803 (1985) (citation omitted). Although there are five factors, the "decisive test ... is whether the employer has the right to control and direct the employee in the performance of the work and in the manner in which the work is to be done." *Mackall v. Zayre Corp.,* 293 Md. 221, 230, 443 A.2d 98 (1982). *See also Whitehead,* 304 Md. at 78, 497 A.2d 803; *Sanders v. Rowan,* 61 Md.App. 40, 51, 484 A.2d 1023 (1984); *L.M.T. Steel Prods., Inc. v. Peirson,* 47 Md.App. 633, 635–36, 425 A.2d 242, *cert. denied,* 290 Md. 717 (1981). If the right to control is not present, and instead, the worker in question is to perform the work "according to his own means and methods free from control of his employer in all details connected with the performance of the work except as to its product or result," then the worker is considered to be an independent contractor. *L.M.T Steel Prods.,* 47 Md.App. at 636, 425 A.2d 242 (quoting *Williams Constr. Co. v. Bohlen,* 189 Md. 576, 580, 56 A.2d 694 (1948)). *See also Sanders, supra.*

We turn now to the case *sub judice.* Appellant cannot refer to a single fact that shows it had control over appellees as to the means and methods they used in the performance of their work. The only control Baker, Watts exercised over appellees was that it established the end result it wanted them to achieve. This control is not sufficient, as a

matter of law, to establish appellees as employees of Baker, Watts. Accordingly, the circuit court did not err in granting appellees' motion for summary judgment regarding their status as employees of Baker, Watts.[8]

### Is There a Material Factual Dispute That Appellees Were Sellers Under the Maryland Securities Act?

██ Baker, Watts argues that appellees are also liable because they directly participated in the sale of securities— the very sale that gave rise to Baker, Watts's liability in the *Adalman* case. Baker, Watts contends that appellees are "sellers," and, in its briefs, refers this Court to § 11–703(a) of the Maryland Securities Act, which imposes liability on a "seller" in certain enumerated instances. Because Baker,

---

**8.** Baker, Watts relies on an out-of-state case to argue that an attorney can be considered an employee within § 11–703(c). In *Ackerman, Jablonski, Porterfield & DeTure v. Alhadeff,* Blue Sky L.Rep. (CCH) ¶ 72,390 (W.D.Wash.1986), the district court denied the defendant accounting firm's motion to dismiss because the plaintiff had alleged sufficient facts to establish that the accounting firm could be considered an employee of the primary violator under Washington's version of § 11–703(c). The district court merely recognized that an accounting firm *could be* considered an employee of the primary violator. This Court has agreed with Baker, Watts that an attorney could be considered his or her client's employee *if* the requisite criteria are present. As previously discussed, however, the necessary criteria are not present in the case at bar.

Baker, Watts also refers us to *Collins v. Fitzwater,* 277 Or. 401, 560 P.2d 1074 (1977), to support its argument that the policy behind the Uniform Securities Act allows for an attorney, employed by a corporation, to be liable if he or she is culpable for the corporation's securities laws violation. In *Collins,* the Supreme Court of Oregon held that a director, liable because the corporation had sold unregistered securities, could seek indemnification from the corporation's attorney. *Id.* 560 P.2d at 1078. This case is distinguishable from the case before us on two grounds. First, under the Fourth Circuit's ruling, Baker, Watts may not seek indemnification. *Baker, Watts & Co. v. Miles & Stockbridge,* 876 F.2d 1101, 1108 (4th Cir.1989). Second, the defendant attorney in *Collins* was also a director of the corporation that had sold unregistered securities in violation of state securities laws. As a result, this case is of no assistance to Baker, Watts.

Watts's theory of recovery is premised on appellees being "sellers," Baker, Watts's claim is under § 11–703(a).

Section 11–703(a) provides, in relevant part:

(a) *When seller, purchaser or advisor liable.*—(1) A person is civilly liable to the person buying a security from him if he:

* * * * * *

(ii) Offers or sells the security by means of any untrue statement of a material fact or any omission to state a material fact....

Definitions necessary for construing § 11–703(a) are contained in § 11–101 of the Maryland Securities Act, which provides, in part:

(k) *Offer; offer to sell.*—"Offer" or "offer to sell" ... includes every attempt or offer to dispose of or solicitation of an offer to buy, a security or interest in a security for value.

(n) *Sale; sell.*—"Sale" or "sell" ... includes every contract of sale of, contract to sell, or disposition of a security or interest in a security for value.

 Once again we consider the interpretation given to the term "seller" by the federal courts under similar language in the Securities Act of 1933, § 12(1) & (2).[9] *See Caucus Distribs., Inc. v. Md. Sec. Comm'r,* 320 Md. 313, 324, 577 A.2d 783 (1990). Section 11–703(a) provides a statutory cause of action by a "person buying a security" against his or her offeror or seller. A seller is only liable to

---

**9.** Section 12 of the Securities Act provides, in pertinent part:

§ 77*l.* **Civil liabilities arising in connection with prospectuses and communications**

Any person who—

(1) offers or sells a security in violation of section 77e of this title, or

(2) offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails ...

shall be liable to the person purchasing such security from him....

15 U.S.C. § 77*l* (1988).

his or her buyer. *See Pinter v. Dahl*, 486 U.S. 622, 643–44 & n. 21, 108 S.Ct. 2063, 2076–77 & n. 21, 100 L.Ed.2d 658 (1988) (only a defendant *from* whom the plaintiff *purchased* securities may be liable under the Securities Act of 1933, § 12(1), 15 U.S.C. § 77*l*); *Akerman v. Oryx Communications, Inc.*, 810 F.2d 336, 344 (2d Cir.1987) (only "the person purchasing such security from" the seller or offeror has standing to sue under § 12(2)); *Mercer v. Jaffe, Snider, Raitt & Heuer, P.C.*, 713 F.Supp. 1019, 1023–24 (W.D.Mich. 1989), *aff'd*, 933 F.2d 1008 (6th Cir.1991) (complaint failed to state a claim because it did not show that attorneys were persons from whom plaintiffs purchased securities within the meaning of the statute). It is indisputable that Baker, Watts did not purchase securities from appellees. Therefore, Baker, Watts does not have a statutory cause of action against appellees as "sellers" and this Court will not imply such an action. Md. Corps. & Ass'ns Code Ann. § 11–703(a)(1)(i) (1993); *Baker, Watts & Co. v. Miles & Stockbridge*, 690 F.Supp. 431, 435–36 (D.Md.1988), *aff'd in part and rev'd in part*, 876 F.2d 1101 (4th Cir.1989); *Goodman v. Poland*, 395 F.Supp. 660, 681 (D.Md.1975). Consequently, the circuit court's grant of summary judgment regarding appellees' liability as sellers was correct.

Even if we were to reach the question of whether there is a material factual dispute that appellees were "sellers" we would still affirm the circuit court's grant of summary judgment. In *Pinter v. Dahl, supra,* the Supreme Court, in construing the term "seller" in § 12(1) of the Securities Act of 1933, held that in order for a person to be considered a "seller," two things must be present. First, the person must pass title to the buyer or successfully *solicit* the purchase of securities. 486 U.S. at 642–47, 108 S.Ct. at 2076–79. Second, the person must be "motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* at 647, 108 S.Ct. at 2078. Black's Law Dictionary (5th ed. 1983) defines "solicit" as "[t]o appeal for something; to apply to for obtaining some-

thing ... to ask for the purpose of receiving.... The term implies personal petition and importunity addressed to a particular individual to do some particular thing." *Id.* at 723. In addition, the Supreme Court, in *Pinter,* expressly cautioned against expanding § 12(1) to include attorneys and accountants who merely perform their professional functions in preparing documents for an offering. The Supreme Court stated that it was rejecting the "substantial factor" test argued for by the petitioners because:

> [The substantial factor test] might expose securities professionals, such as accountants and lawyers, whose involvement is only the performance of their professional services, to § 12(1) strict liability for rescission. The buyer does not, in any meaningful sense, "purchas[e] the security from" such a person.

*Pinter,* 486 U.S. at 651, 108 S.Ct. at 2080. For these same reasons, the Supreme Court also rejected a test based on "participat[ion] in soliciting the purchase" suggested by the Securities and Exchange Commission in its *Amicus Curiae* brief. *Id.* at 651 n. 27, 108 S.Ct. at 2081 n. 27.

Baker, Watts argues that appellees' preparation of the offering memorandum and their fees for services rendered bring them within the definition set forth in *Pinter.* We disagree. Baker, Watts cannot refer this Court, and was unable to refer the circuit court, to a single fact that demonstrates that appellees "solicited" the purchase of the limited partnership interests—that appellees did anything more than perform their professional services.[10] *See Ackerman v. Schwartz,* 947 F.2d 841, 844 (7th Cir.1991) (attorney who wrote an opinion letter stating that investors were entitled to credits and reductions as touted by promoter of fraudulent tax shelter was not a seller within the meaning

---

10. Appellant also refers us to actions by appellees outside the sale of the limited partnership interests in question. Such actions are irrelevant to the question of whether appellees were "sellers" of the limited partnership interests.

of the Securities Act of 1933, § 12(2)); *Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1126–27 (2d Cir.1989) (law firm that prepared and distributed a private placement memorandum for a private securities offering conducted by the law firm's client was not a "seller" within § 12(2)); *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1114–15 (5th Cir.1988), (law firm that helped prepare offering statement in a bond issuance was not a seller within § 12(1) & (2)), *vacated on other grounds sub nom. Fryar v. Abell*, 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989); *Riedel v. Acutote of Colo.*, 773 F.Supp. 1055, 1061–62 (S.D.Ohio 1991) (mere fact that "attorney worked on a prospectus does not make him a 'seller' under the securities laws"); *Mercer v. Jaffe, Snider, Raitt & Heuer, P.C.*, 713 F.Supp. 1019, 1024 (W.D.Mich.1989), *aff'd*, 933 F.2d 1008 (6th Cir. 1991) ("quite obviously, buyers commonly do not say that they purchased securities from lawyers or law firms that helped to prepare promotional material or offering statements").

## III.

Appellant next contends that the circuit court's dismissal of its state common-law claims for malpractice, breach of contract, and negligent misrepresentation, based on the running of the statute of limitations, was improper. Appellant argues that because the claims were for contribution, the limitations period began to run from the date of its payment to the *Adalman* investors and not from the date judgment was entered by the U.S. District Court. Appellant further argues that the action it filed in state court on 23 October 1987, which was subsequently removed and consolidated with appellant's federal court action, satisfied the statute of limitations because the case was ultimately dismissed from federal court "for technical and nonsubstantive reasons." In contrast, appellees argue that appellants have no right to contribution absent a statute and that the

proceedings in federal court did not toll the statute of limitations.

As indicated, this question reaches us on appeal from a grant of a motion to dismiss pursuant to Md.Rule 2-322(b). In reviewing a disposition by a motion to dismiss, "we must assume the truth of all relevant and material facts that are well pleaded and all inferences which can be reasonably drawn from those pleadings." *Sharrow v. State Farm Mut. Auto. Ins. Co.*, 306 Md. 754, 768, 511 A.2d 492 (1986). In addition, "we consider appellant['s] well-pleaded allegations in the light most favorable to [appellant]." *Berman v. Karvounis*, 308 Md. 259, 264, 518 A.2d 726 (1987).

The applicable dates in the case *sub judice*, necessary for a discussion of the statute of limitations, are outlined below:

April 1983—*Adalman* investors file suit against Baker, Watts;

31 July 1985—Order of the U.S. District Court for the District of Maryland entering judgment against Baker, Watts in the *Adalman* case is filed;

23 October 1987—Baker, Watts files almost identical actions against appellees in the U.S. District Court for the District of Maryland and in the Circuit Court for Baltimore City;

24 November 1987—appellees' motion to have the state court action removed to federal court is granted;

18 March 1988—the federal court action and the removed state court action are consolidated;

27 June 1988—the U.S. District Court grants in part and denies in part appellees' motion for summary judgment, but remands Baker, Watts's state common-law claims for malpractice, breach of contract, and negligent misrepresentation to the Circuit Court for Baltimore City;

Both parties, at a date not ascertainable from the record extract, appealed the U.S. District Court's ruling to the U.S. Court of Appeals for the Fourth Circuit;

7 June 1989—the Fourth Circuit affirms in part and reverses in part the district court's ruling and orders the district court, *inter alia*, to dismiss Baker, Watts's state common-law claims without prejudice;

20 September 1989—the U.S. District Court orders the dismissal of Baker, Watts's state common-law claims, without prejudice;

20 October 1989—Baker, Watts files a complaint in the Circuit Court of Baltimore City seeking contribution from appellees based on, *inter alia*, the state common-law claims for malpractice, breach of contract, and negligent misrepresentation;

30 November 1989—appellees file a motion to dismiss Baker, Watts's state common-law claims because, *inter alia*, the claims are barred by the statute of limitations;

9 May 1990—the Circuit Court grants appellees' motion to dismiss the state common-law claims because the statute of limitations has run.

 Ordinarily, a cause of action must be filed within three years from the date it accrues. Md.Cts. & Jud. Proc.Code Ann. § 5–101 (1989). Under the "discovery rule," made applicable to all actions in *Poffenberger v. Risser*, 290 Md. 631, 636, 431 A.2d 677 (1981), a cause of action accrues when the claimant in fact knew of or through due diligence should have discovered the wrong. *Id.* at 634–36, 431 A.2d 677. A cause of action, however, cannot accrue until all the elements are present, including damages. *Goldstein v. Potomac Elec. Power Co.*, 285 Md. 673, 685, 404 A.2d 1064 (1979). Additionally, a claim for "contribution from a joint tortfeasor does not accrue for statute of limitations purposes until payment by the claimant." *Wash. Suburban Sanitary Comm'n v. Riverdale Heights Vol. Fire Co.*, 308 Md. 556, 570 n. 3, 520 A.2d 1319 (1987). *See also S. Md. Oil Co. v. The Tex. Co.*, 203 F.Supp. 449, 452–53 (D.Md.1962) (the right to contribution, whether based on contract or tort, does not accrue until the time of payment).

This issue breaks down into two questions. We address each question separately.

### Does Baker, Watts Have a Right to Contribution From Appellees Based on its State Common–Law Claims?

 Baker, Watts claims that its common-law causes of action are for contribution and thus, the limitations period did not begin to run until 28 November 1986—the date Baker, Watts made payment to the *Adalman* investors. Consequently, appellant argues, the complaint filed in the Circuit Court for Baltimore City on 20 October 1989 satisfied the three year statute of limitations. Joint tortfeasors have a right to contribution under the Uniform Contribution Among Tort–Feasors Act, codified in Maryland at Md.Ann.Code art. 50, § 16 *et seq.* (1991). Article 50, § 16(a) defines "joint tort-feasors" as:

[T]wo or more persons jointly or severally liable *in tort* for the same injury to person or property, whether or not judgment has been recovered against all or some of them.

(Emphasis supplied). "The right to contribution, which a concurrent wrongdoer may have from another culpable party, arises from the duty each of the wrongdoers owes to the injured party." *Bd. of Trustees of the Baltimore County Community Colleges v. RTKL Assocs., Inc.,* 80 Md.App. 45, 55, 559 A.2d 805 (1989), *cert. dismissed,* 319 Md. 274, 572 A.2d 167 (1990). *See also Pyramid Condominium Ass'n v. Morgan,* 606 F.Supp. 592, 598 (D.Md. 1985). Contribution is a derivative right and not a new cause of action. *Ennis v. Donovan,* 222 Md. 536, 539, 161 A.2d 698 (1960); *Baltimore Transit Co. v. State,* 183 Md. 674, 679, 39 A.2d 858 (1944). Finally, when a party's liability is not grounded on tort law, he or she cannot be considered a joint tortfeasor. *See Huff v. Harbaugh,* 49 Md.App. 661, 665–68, 435 A.2d 108 (1981) (party whose liability sounded in contract could not be a joint tortfeasor with another party whose liability sounded in tort even though they were liable for the same injury).

 Baker, Watts presents two causes of action that

sound in tort—attorney malpractice [11] and negligent misrepresentation. Because Baker, Watts was held liable in the *Adalman* case for violations of § 12(2) of the Securities Act of 1933 and § 11–703(a)(1)(ii) of the Maryland Securities Act, Baker, Watts is not a tortfeasor. Therefore, Baker, Watts cannot avail itself of the right to contribution provided for joint tortfeasors pursuant to Article 50, § 17 of the Maryland Code. Consequently, Baker, Watts cannot establish that its cause of action for malpractice and negligent misrepresentation accrued on the date it made payment to the *Adalman* investors—28 November 1986. Rather, the date these causes of action accrued was on 31 July 1985—the date the U.S. District Court entered judgment against Baker, Watts in the *Adalman* case. The remaining question as to the claims for attorney malpractice and negligent misrepresentation is whether Baker, Watts's filing of its action in the Baltimore City Circuit Court, which was removed and consolidated with Baker, Watt's federal court action, tolled the running of the limitations period. We address this question *infra*.

■ Next we consider whether Baker, Watts can establish the date of its payment to the *Adalman* investors as the date its cause of action accrued for appellees' alleged breach of contract. Appellant takes the position that it has a common-law right to contribution based on a breach of contract theory. In contrast, appellees argue that a party has no right to contribution under Maryland law unless there is a statute conferring such a right. We disagree with both parties' positions. Nevertheless, we hold that

---

**11.** The Court of Appeals has classified an action for attorney malpractice as one in contract, but has also recognized that the gravamen of the claim is for the negligent breach of a contractual duty. *Flaherty v. Weinberg*, 303 Md. 116, 134, 492 A.2d 618 (1985); *Mumford v. Staton, Whaley & Price*, 254 Md. 697, 705–06, 255 A.2d 359 (1969). In addition, an action against an attorney for malpractice may be brought in contract or in tort. *Flaherty*, 303 Md. at 134, 255 A.2d 359. Because appellant has stated one claim for "Malpractice" under Count I and another claim for "Breach of Contract" under Count III, we treat the claim for malpractice as one in tort, i.e., for negligence.

Baker, Watts does not have a claim for contribution under its breach of contract theory; thus, Baker, Watts's cause of action for breach of contract accrued on 31 July 1985—the date the U.S. District Court entered judgment against Baker, Watts in the *Adalman* case.[12] We explain our holding.

Baker, Watts is unable to refer this Court to any law that clearly states that a party may seek contribution based on a contract theory that parallels its claim. Nor are appellees able to point to a case clearly holding that a party may *not* seek contribution based on a contract theory absent a statute granting such a right. We discuss the cases to which the parties refer us and what we have uncovered in our own research.

Appellees rely on the Court of Appeals' decision in *Montgomery County v. Valk Mfg. Co.*, 317 Md. 185, 189–91, 562 A.2d 1246 (1989), to argue that, under Maryland law, there is no right of contribution in the absence of a statute. We decline to read the pages to which appellees refers us as supporting this contention. The Court of Appeals's opinion speaks in terms of contribution among joint tortfeasors and traces the developments in tort law leading ultimately to the adoption of the Uniform Contribution Among Tort-Feasors Act and is, therefore, distinguishable from the present case.

Appellant refers us to several Court of Appeals decisions to support its proposition that it is entitled to contribution based on a contract theory. Appellant argues that the cases recognize that one debtor may claim contribution from another debtor equally charged with the obligation which one debtor has discharged. Appellant claims that *Craig v. Ankeney*, 4 Gill 225 (1846) permits contribution under the common law of Maryland. In *Craig*, two parties were equally bound as sureties, under separate instru-

---

12. Whether Baker, Watts's filing of its breach of contract claim in the Circuit Court for Baltimore City, which was removed and consolidated with its federal cause of action, on 24 November 1987 tolls the running of the limitations period is discussed *infra*.

ments, for payment of the same debt. When one surety discharged the debt, the Court of Appeals held that he had a cause of action for contribution against the other surety. *Craig* is thus distinguishable from the case at bar because both parties were bound by a mutual obligation under legally enforceable instruments; they were, in fact, joint debtors. No such mutual obligation is present in the case before us.

Appellant also relies on *Lyon v. Campbell*, 324 Md. 178, 596 A.2d 1012 (1991), in which the Court of Appeals held that a corporate officer who discharged a corporate tax liability in accordance with a Maryland tax statute could seek contribution from other corporate officers. The income tax withholding statute in question provided, in part, that if a corporate employer:

negligently fails to withhold or pay income tax ... personal liability for that income tax extends ... to

(i) any officer of the corporation who exercises direct control over its fiscal management; or

(ii) any agent of the corporation who is required to withhold and pay the income tax.

Md.Tax–Gen.Code Ann. § 10–906(d) (1988 & Supp.1991). The Court held that the parties listed in the statute were jointly and severally liable; thus, when one officer discharged the common obligation, he had a right to contribution from the other officer. *Lyon*, 324 Md. at 183, 596 A.2d 1012. In contrast, the parties in the case *sub judice* are not laboring under a common obligation; therefore, this case is inapposite to appellant's claim.

Appellant next refers us to *Jackson v. Cupples*, 239 Md. 637, 212 A.2d 273 (1965) to argue that "one joint obligor may claim contribution from another such obligor for having discharged their mutual obligation." *Id.* at 640, 212 A.2d 273. In *Jackson*, the Court of Appeals held that the co-endorsers of a note, who discharged the liability of all the endorsers under the note, had stated a claim for contribution from the co-endorsers who had failed to pay their pro rata share of the obligation. This case is distinguishable

from the instant case because all the parties were bound by an instrument to discharge the obligation. Additionally, Black's Law Dictionary (5th ed. 1983) defines an "obligor" as "[a] promisor. The person who has engaged to perform some obligation. Person obligated under a contract or bond." *Id.* at 556. Appellees cannot be considered a joint obligor, with Baker, Watts, to the *Adalman* investors; thus, they cannot be held liable for contribution to an obligation to which only Baker, Watts was bound.

The cases to which appellant referred this Court in its briefs and the cases we examined in our own research support the general rule that there is contribution among parties to a contract; however, the cases impose liability for contribution only when the parties are bound by a statute, by an instrument or instruments, or by law such that they are legally and jointly obligated to pay the debt. *See Mallis v. Faraclas*, 235 Md. 109, 200 A.2d 676 (1964) (partners jointly obligated for partnership debt); *Cunningham v. Cunningham*, 158 Md. 372, 148 A. 444 (1930) (husband and wife as joint and equal principals on a mortgage had the right of proportionate contribution); *Brady v. Brady*, 110 Md. 656, 73 A. 567 (1909) (joint maker of a note who paid the whole amount due on the note may seek contribution from the co-maker). *See also* 5A M.L.E. *Contribution* § 3 (1982); 18 C.J.S. *Contribution* § 9 (1990). In contrast, in the present case, appellant and appellees are *not* joint obligors, as outlined in the cases discussed, to the *Adalman* investors. Rather, Baker, Watts's claim is premised on appellees' breach of a contract between appellant and appellees, which resulted in Baker, Watts's liability to the *Adalman* investors under federal and state securities laws. Because appellant is unable to refer us to any authority for its contention that it is entitled to contribution from appellees based on its unique contract theory, we hold that Baker, Watts has no such right to contribution. Baker, Watts's cause of action for breach of contract, therefore, accrued on the date the U.S. District Court for the District

of Maryland entered judgment against Baker, Watts—31 July 1985.[13]

*Did Baker, Watts's Filing of its Claim in The Circuit Court for Baltimore City, Which was Removed and Consolidated with its Federal Cause of Action, Toll the Running of the Statute of Limitations?*

On 23 October 1987, Baker, Watts filed almost identical complaints against appellees in state and federal court.[14] Pursuant to appellees' motion, the state action was removed to federal court on 24 November 1987 and the state and federal cases were consolidated on 18 March 1988. The state common-law claims for contribution were dismissed without prejudice by the U.S. District Court on 20 September 1989.

▬▬ Baker, Watts argues that because the district court's order, following appellees' motion for summary judgment in federal court, dated 27 June 1988, remanded the state common-law claims to the Circuit Court for Baltimore City, the state action remained pending, but stayed. It was from this order that both parties appealed to the Fourth Circuit Court of Appeals and it was the Fourth Circuit that ordered the district court to dismiss the state common law claims without prejudice. The district court filed such an order on 20 September 1989. Appellant's argument is without merit and the circuit court was correct in finding that Baker, Watts's claim was barred because the statute of limitations had run.

---

**13.** Appellees seem to imply that the date the *Adalman* investors filed suit against Baker, Watts—April 1983—is the date that appellant's cause of action accrued. We believe, however, that the cause of action did not accrue until judgment was entered against Baker, Watts because that was the date on which all elements of Baker, Watts's claims against appellees were present. *See Watson v. Dorsey,* 265 Md. 509, 512–13, 290 A.2d 530 (1972); *Am. Home Assurance Co. v. Osbourn,* 47 Md.App. 73, 87, 422 A.2d 8 (1980), *cert. denied,* 289 Md. 739 (1981).

**14.** Both complaints included federal causes of action.

Appellant attempts to argue that, in general, a defense of statute of limitations is disfavored and should be sparingly granted. To support this contention appellant refers us to the Court of Appeals decision in *Foos v. Steinberg*, 247 Md. 35, 230 A.2d 79 (1967). In *Foos*, the trial court granted the defendant's motion for summary judgment because the plaintiff's claim was barred by the statute of limitations. On appeal, the court reversed the trial court because the defendant's plea of limitations was not filed within the time required by the Maryland Rules and was, thus, improperly considered. Although the court did state that "[t]he plea of limitations is not looked upon favorably by the courts and accordingly the rules governing it are to be strictly construed," the court further stated that "[i]t has generally been the practice in Maryland to require pleas of limitations to be filed by the rule day." *Id.* at 38, 230 A.2d 79. We believe it is clear from the *Foos* opinion that the trial court's holding that the statute of limitations had run would have been proper if the motion for summary judgment had been filed within the time allotted by the rules.

Appellant also relies on *Bertonazzi v. Hillman*, 241 Md. 361, 216 A.2d 723 (1966), in which the Court of Appeals allowed a suit filed within the three year period of limitations in Baltimore County, but which was dismissed for improper venue, to be refiled in Baltimore City despite the fact that the limitations period had run while the suit was pending in Baltimore County. The Court held that the improper filing in Baltimore County tolled the running of the statute of limitations.

The Court of Appeals' holding in *Walko Corp. v. Burger Chef Sys., Inc.*, 281 Md. 207, 378 A.2d 1100 (1977), however, clarifies its decision in *Bertonazzi*. In *Walko*, the Court of Appeals held that a motion to intervene which was ultimately denied by the U.S. District Court for the District of Columbia did not toll the running of the statute of limita-

tions.[15] In its opinion, the Court explicitly addressed its holding in *Bertonazzi,* stating, in relevant part:

At first blush, *Bertonazzi* . . . would appear to stand as authority for the broad proposition that under Maryland law the running of the limitations period is tolled by a procedurally defective action which is timely filed. This is not borne out, however, by an analysis of that case.

\* \* \* \* \* \*

In *Bertonazzi* the Court carved out a narrow exception to the traditional rule against engrafting implied exceptions upon the statute of limitations in certain situations where the sole reason for the dismissal of the prior action was improper venue. . . . *Bertonazzi* stands alone, then, confined to the special circumstances which culminated in the filing of the suit in the wrong county.

*Walko,* 281 Md. at 213–14, 378 A.2d 1100. The Court also reiterated the traditional rule concerning the tolling of the statute of limitations:

"The principle of law is indisputable, that when the Statute of Limitations once begins to run, nothing will stop or impede its operation." *Ruff v. Bull,* 7 H. & J. 14, 16 (1825).

\* \* \* \* \* \*

"[W]here the Legislature has not made an exception in express words in the Statute of Limitations, the Court cannot allow any implied and equitable exception to be engrafted upon the statute merely on the ground that such exception would be within the spirit or reason of the statute." [*McMahan v. Dorchester Fertilizer Co.,* 184 Md. 155, 160, 40 A.2d 313 (1944).]

This venerable rule, which defers to the legislative intent expressed in the statute of limitations itself, and avoids implied exceptions or strained constructions, is also applicable in cases such as the one at bar where an

---

**15.** The motion to intervene was denied because the district court found that the intervenor's claims were unrelated to the subject matter of the underlying suit. *Walko,* 281 Md. at 209, 378 A.2d 1100.

action filed initially within the required period fails for some technical, procedural defect falling short of a full decision on the merits. *Absent a statutory provision saving the plaintiff's rights, remedy is barred where limitations has run during the pendency of the defective suit.*

*Id.* at 211–12 (emphasis supplied) (some citations omitted) (footnote omitted).

We believe that the Court of Appeals decision in *Walko* is dispositive of appellant's claim. The suit Baker, Watts filed in the Circuit Court for Baltimore City on 23 October 1987 was procedurally defective and was ultimately dismissed by the U.S. District Court; therefore, the running of the limitations period was not tolled during the pendency of the suit in federal court.[16] Consequently, we affirm the circuit court's dismissal of Baker, Watts's state common-law claims.[17]

## IV.

Baker, Watts's final argument is that the circuit court erred in granting appellees' motion *in limine,* which barred Baker, Watts, its counsel, and its witnesses from making any reference to the claims asserted in the *Adalman* case. Because we hold that the circuit court properly granted

---

**16.** Since Baker, Watts commenced this litigation, Maryland has adopted Rule 2–101(b), which would have saved appellant's action if it was filed within thirty days of dismissal by the U.S. District Court. Rule 2–101(b) is of no help to Baker, Watts, however, because absent a clear expression to the contrary, statutes are presumed to act prospectively, not retrospectively. *Wash. Suburban Sanitary Comm'n v. Riverdale Heights Volunteer Fire Co.,* 308 Md. 556, 560–61, 520 A.2d 1319 (1987).

**17.** Because we hold that the circuit court properly dismissed Baker, Watts's state common law claims as barred by the statute of limitations, we need not decide whether the claims were for indemnification. If the claims were for indemnification they would also fail because such claims are preempted by federal law, which does not permit indemnification for violations of federal securities laws. *Baker, Watts & Co. v. Miles & Stockbridge,* 876 F.2d 1101 (4th Cir.1989).

appellees' motion for summary judgment regarding Baker, Watts's claim for contribution under the Maryland Securities Act and that the circuit court properly dismissed Baker, Watts's state common-law claims as barred by the statute of limitations, we need not reach this question.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.